UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.  19-cv-01069-JCS

**ORDER RE:**

M. G.,

　　　　　Plaintiff,

　　　v.

BODUM USA, INC.,

　　　　　Defendant.

1)  **PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DEFENSE EXPERT DR. GABRIEL GANOT AND FOR PARTIAL  SUMMARY JUDGEMENT ON STRICT LIABILITY CLAIMS**

2)  **DEFENDANT BODUM USA, INC.'S MOTION FOR SUMMARY JUDGMENT**

3)  **DEFENDANT BODUM USA, INC.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF JIM GOLDMAN**

Re: Dkt. Nos. 66, 67, 68

## I.　　INTRODUCTION

In this products liability case, Plaintiff M.G., a minor who is proceeding through a guardian ad litem, asserts claims against Defendant Bodum USA, Inc. ("Bodum") based on an accident that occurred when she was using a Bodum French press coffeemaker in which the glass beaker fractured, causing M.G. to suffer severe burns.  Presently before the Court are the following motions: 1) Plaintiff's Motion To Exclude Testimony Of Defense Expert Dr. Gabriel Ganot And For Partial  Summary Judgement On Strict Liability Claims ("Plaintiff's *Daubert/*

Summary Judgment Motion"); 2) Defendant Bodum USA, Inc.'s Motion For Summary Judgment

("Defendant's Summary Judgment Motion"); and 3) Defendant Bodum USA, Inc.'s Motion To

Exclude Expert Testimony Of Jim Goldman ("Defendant's *Daubert* Motion").  For the reasons set

forth below, the Court Denies Plaintiff's *Daubert/*Summary Judgment Motion, DENIES

Defendant's *Daubert* Motion and GRANTS in part and DENIES in part Defendant's Summary

Judgment Motion.[1]

## II.     BACKGROUND

### A.     Factual Background[2]

#### 1. The Incident

Many of the facts about the incident that gave rise to this case (the "Incident") are

undisputed.  The device at issue was a Bodum 1-liter Chambord 8-cup French press.[3]  *See*

Declaration of Khaldoun A. Baghdadi in Support of Motion To Exclude Testimony of Defense

Expert Dr. Gabriel Ganot and for Partial Summary Judgement on Strict Liability Claims

("Baghdadi *Daubert* / Summary Judgment Decl."), Ex. 3 (Ganot Report) at 1.  M.G.'s father, John

Grant, purchased the French Press at Macys in October 2017 to replace a French press that had

broken.  Declaration of Jason A. Wheeler in Support of Defendant Bodum USA, Inc.'s Motion for

Summary Judgment ("Wheeler Summary Judgment Decl."), Ex. B (J. Grant Dep.) at 18-21.

M.G.'s mother, Michell Grant recalled that she and her husband had had two French presses

before, the first of which was a Bodum and the second of which was from a different company.

*Id.*, Ex. C (M. Grant Dep.) at 14.  She testified that both broke "in the sink" while being washed.

*Id.*  After returning home, Mr. Grant removed the French Press from its packaging, which he

recycled.  *Id.*  at 61.  He admits that he did not read the instructions that came with the French

Press.  *Id.* at 65.  M.G.'s mother, Michelle Grant, also does not remember seeing or reading the

instructions that came with the French Press.  *Id.*, Ex. C (M. Grant Dep.) at 24, 32.  However, she

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).
[2] Unless otherwise stated, the facts set forth in this section are those that the Court finds to be undisputed based on the current record.
[3] The Court refers to the specific product that fractured as the "French Press" or the "Grant French Press."

United States District Court
Northern District of California

remembers reading some of the warnings printed on the previous Bodum French press the Grants owned. *Id.* at 20.

Until the Incident, which occurred on January 23, 2018,[4] the Grants made coffee every day using the French Press and did not have any problems. *Id.* at 37, 47. Mrs. Grant testified that she and her husband used coffee they purchased at Safeway or Vons and ground the beans at the grocery store on the "fine" setting. *Id.* at 42-43. Mr. Grant testified that at the time of the Incident, he and his wife had stopped grinding the beans themselves and were buying coffee that was already ground and that the beans were ground for a French press. *Id.*, Ex. B (J. Grant Dep.) at 67-69. At some point, Mr. Grant showed M.G. how to use the French Press. *Id.* at 96. Mr. Grant testified that prior to the Incident, M.G. used the French Press to make coffee more than once and less than five times. *Id.* at 100. Mrs. Grant testified that she had no knowledge of M.G. using the French Press prior to the Incident. *Id.*, Ex. C (M. Grant Dep.) at 47.

On the morning of the Incident, Mrs. Grant woke up around 6:30 a.m. *Id.* Mr. Grant had already left for work. *Id.* Mrs. Grant began to make coffee by turning the kettle on and placing ground coffee in the French Press. *Id.* at 49-50. She then left the room to get dressed. *Id.* When the kettle whistled, Mrs. Grant ask M.G., who was in the kitchen alone, to turn it off. *Id.* at 53. According to M.G., she decided to help her mom by making coffee that morning. Rose Opp. Decl., Ex. 3 (M.G. Decl.) ¶ 3. She states in her declaration that she "had made coffee with it before[ ] and liked to help [her] parents with cooking and baking tasks in the kitchen." *Id.* ¶ 4. She describes what occurred next as follows:

> When I turned the kettle off . . . , the French Press coffee maker was sitting on the kitchen counter. I could see that there were coffee grounds in the bottom of the press. I knew that the next step was to pour the hot water into the French Press . . . . I waited about three minutes after I turned the kettle off, and then poured water from the kettle into the French Press. I was standing with both feet on the ground in front of the Press on the kitchen counter when I poured the water. . . . Next, I put the lid on the French Press and began to slowly press downward on the plunger. I used one hand. I was standing with

---

[4]In Defendant's Summary Judgment Motion at page 3, Bodum states that the Incident occurred on January 18, 2018. However, it cites to page 47 of Michelle Grant's deposition, where Mrs. Grant testified that the incident occurred on January 23, 2018. At oral argument, the parties stipulated that the correct date is January 23, 2018.

United States District Court
Northern District of California

> both feet on the ground in front of the French Press, which was still on the kitchen counter. . . . Around two full seconds after I began pressing the plunger downward, I heard a loud "pop" and I saw a piece of glass come flying out of the side of the French Press.

*Id.* ¶¶ 5-8.  M.G. was ten years old at the time of the Incident.   Wheeler Summary Judgment Decl., Ex. B (J. Grant Dep.) at 93.

### 2. Warnings

The French Press purchased by Mr. Grant contained an instruction booklet inside the glass container. Wheeler Summary Judgment Decl., Ex. G (May 20, 2020 Goldman Report ("Goldman Report")) at 31. It includes sections entitled, "Instructions for Use," "Safety Instructions," and "Scald Hazards."  *Id.*, Ex. A (Goldman Dep.), Ex. E. The "Instructions for Use" section contains the following warning:  "CAUTION: Use only coarse ground coffee. Fine grind can clog the filter and create high pressure. Place coffee maker on a heat proof, non-slip surface." *Id.*  It also states: "CAUTION: Metal spoons can scratch or chip the beaker and cause damage."  *Id.*

The "Instructions for Use" section is followed by the "Safety Instructions" heading, which is in all capital letters, printed in red, and carries a warning symbol.  Under the heading, the following warnings are printed in bold:

- **Not for stove top use**.
- **Check beaker for scratches, cracks or chips. Do not use a pot which is scratched, chipped or cracked. Install a replacement beaker before using the pot again.**
- **Keep children away while using. Hot water is a hazard to small children! Do not allow children to use this coffee maker**.

*Id.*

This section is followed by the "Scald Hazard" heading, which is also in all capital letters, printed in red, and preceded by a warning symbol.  *Id.*   This section contains the following warnings:

- **Excessive plunging force can cause scalding hot liquid to shoot out of pot.**
- **Do not plunge with force.**

United States District Court
Northern District of California

4

1      •   **Turn lid to close spout.**

2      •   **Use only coarse ground coffee.**

3   *Id.*

4        In addition, the following warnings were printed on the beaker of the French Press, in all

5   capital letters:

6       READ INSTRUCTION BEFORE USE

7       NOT FOR STOVE TOP USE

8       CHILDREN AND HOT FLUIDS SHOULD BE KEPT APART

9       HOT FLUIDS MUST BE HANDLED WITH CARE

10      ALWAYS USE COARSE GROUND COFFEE

11      ALWAYS STIR BEFORE PRESSING DOWN, USING A PLASTIC OR WOODEN

12      SPOON, NOT METAL

13      BEFORE PRESSING DOWN, ENSURE THAT SAFETY LID IS IN THE CORRECT

14      POSITION

15      PRESS DOWN VERY GENTLY

16   *Id.*, Ex. H (September 9, 2020 Goldman Report ("Goldman Rebuttal Report")) at 9.

17        **3. Experts**

18        M.G. has retained Mr. Jim Goldman as an expert witness.  According to his CV, he is an

19   expert in packaging and glass containers.  Declaration of Jason A. Wheeler in Support of

20   Defendant Bodum USA, Inc.'s Motion to Exclude Expert Testimony of Jim Goldman ("Wheeler

21   *Daubert* Motion Decl."), Ex. H (Goldman CV).  Between 1982 and 2010, he worked as a senior

22   manager of supply chain optimization at the Coca Cola Company.  *Id.*  Bodum has retained Dr.

23   Gabriel Ganot as an expert.  Dr. Ganot specializes in Materials and Corrosion Engineering.

24   Baghdadi *Daubert*/Summary Judgment Decl., Ex. 3 (Ganot Report) at 2.   In 2012, he received his

25   Ph.D. from Columbia University in Materials Science and Engineering.  *Id.*  Since receiving his

26   Ph.D., Dr. Ganot has worked at the consulting firm Exponent, Inc., where he has "performed

27   failure analyses of many fractured glass components and devices including coffee makers, tea

28   infusers, various drinking vessels, toaster oven doors, automotive glass, glass displays used in

United States District Court
Northern District of California

consumer electronics, and various architectural glazing components." *Id.*

Both experts examined the Grant French Press on November 6, 2019. *Id.*; Declaration of Valerie N. Rose in Support of Plaintiff's Opposition to Defendant Bodum USA, Inc.'s Motion to Exclude Expert Testimony of Jim Goldman ("Rose *Daubert* Opposition Decl."), Ex. 2 (Goldman Report) at 2. Based on the glass fracture pattern, they concluded that the Grant French Press broke as a result of internal pressure. Rose *Daubert* Opposition Decl., Ex. 2 (Goldman Report) at 6; Baghdadi *Daubert*/Summary Judgment Decl., Ex. 3 (Ganot Report) at 9. Neither expert found that the glass broke as a result of any external impact. Rose *Daubert* Opposition Decl., Ex. 2 (Goldman Report) at 1; Baghdadi *Daubert*/Summary Judgment Decl., Ex. 3 (Ganot Report) at 4. Neither observed any manufacturing defect on the Grant French Press at the origin of the fracture. Wheeler *Daubert* Motion Decl., Ex. F (Goldman Rebuttal Report) at 1.

Mr. Goldman opines in his opening report that there was no indication that the Grants abused their French Press in any way, concluding that it failed while being used as intended. Rose *Daubert* Opposition Decl., Ex. 2 (Goldman Report) at 1, 19. In particular, he opines that internal pressure caused the Grant French Press to break and that the pressure was associated with the excessively tight fit of the steel plunger, or piston, in the Grant French Press, *Id.* at 6-10. He notes that he observed scratches on the inside of the glass beaker of the Grant French Press that were caused by the tight fit of the piston. *Id.* He opines that "[t]he glass portion of the coffee press failed catastrophically when the circumferential stress created by the thermal expansion of the glass due to the hot liquid plus the circumferential stress created by the descending, compressed piston exceeded the strength of the glass." *Id.* at 11. Using measurements of the fracture pattern he took from the Grant French Press and an equation for calculating the breaking stress of silicate glass, Mr. Goldman found that the total surface stress at the moment of failure was 13,500-psi.[5] *Id.* at 13.

Mr. Goldman also opines that a design change by Bodum reducing the thickness of the

---

[5] According to Dr. Ganot, the tensile strength of borosilicate glass is approximately 10,000 psi. Baghdadi Daubert Decl., Ex. 3 (Ganot Report) at 18. Dr. Ganot defines the "ultimate tensile strength of the glass" as the "stress required to induce a fracture." *Id.* at 13.

United States District Court
Northern District of California

glass used for their French presses weakened it by 30%, rendering it more vulnerable to breakage from internal pressure. *Id.* at 13-19. He points to design documents produced by Bodum dating back to 1956 reflecting that as originally designed, the beaker glass was to be 2.5 mm. thick whereas the beaker in the Grant French Press had an average thickness of only 1.94 mm. *Id.* According to Mr. Goldman, this design change "reduced the weight and therefore the cost of the glass vessel used by Bodum to assemble their Coffee Press" but also "reduced the strength of the Coffee Press to the point that it began regularly failing during foreseeable use." *Id.* at 18.

Mr. Goldman also points to evidence that Schott, the company that supplies the glass cylinders that are used to make Bodum's beakers, provides a formula to calculate the required wall thickness of a cylinder, which is proportional to the diameter. *Id.* at 17. According to Mr. Goldman, Schott offers standard sizes of tubes, with the thickness of the tube increasing depending on its diameter; relying on Schott's standard tubing catalog, he opines that standard tubes with a diameter of 95 mm. – which is the size that would have been used for the Grant French Press – have a wall thickness that ranges from 2.5 mm. to 5.0 mm. *Id.* Instead, Mr. Goldman opines, Bodum uses a thinner, non-standard thickness of tubing for its glass beakers. *Id.* at 18. Mr. Goldman points to testimony by Bodum's COO, Kasper Himmelstrupp, that Bodum orders custom cylinders from Schott glass for its beakers rather than using the standard sizes. *Id.*

Mr. Goldman cites evidence that 8 injury claims were made in 2018, representing a 1200% increase in consumer injury claims associated with Bodum French presses over previous years, and opines that this spike in injuries should have triggered notification to the Consumer Product Safety Commission ("CPSC") and a recall. *Id.* at 27.

Moreover, Mr. Goldman opines, although CPSC regulations require that companies conduct an investigation within 10 days of injuries involving severe burns, Bodum has never conducted such investigations with respect to individual injury claims and does not monitor consumer complaints related to product safety. *Id.* at 20-26. Mr. Goldman points to deposition testimony by Mr. Himmelstrupp regarding specific injury complaints (including a complaint by Todd Buffum, discussed below) indicating that customers who complained to Bodum about injuries due to use of Bodum's French press were sometimes offered shatterproof plastic

United States District Court
Northern District of California

1   replacement presses but that no investigations or safety reviews were conducted and that if legal

2   claims were made, Bodum simply referred them to their insurance company.  *Id.*  In contrast, Mr.

3   Goldman says, Starbucks, which sells Bodum French presses that are made exclusively for

4   Starbucks, has recalled two Bodum French presses since 2014 – the first based on four reports of

5   injuries and the second based on eight reported injuries.  *Id.* at 21-22.

6        Mr. Goldman opines that Bodum could have adopted a safer design for its French presses

7   by using either a plastic or metal beaker.  *Id.* at 30-31.  He further opines that the instructions for

8   the Bodum French Press should warn that it can "explode under foreseeable use."  *Id.* at 31.  He

9   opines that the written instructions, where the warnings are found, warn that fine ground coffee

10  can cause the unit to "clog" but not that it could cause it to explode.  *Id.*  at 31.  Similarly, the

11  instructions warn that pushing the plunger down "with excessive force" may cause scalding water

12  to shoot out of the coffee-maker but not that the coffee-maker may explode.  *Id.*  at 34.

13       Mr. Goldman offered additional opinions in a supplemental expert report dated June 18,

14  2020, in which he addressed a claim by Todd Buffum, who suffered serious burns when his

15  Bodum French Press fractured, on February 24, 2019.  *See generally* Rose *Daubert* Opposition

16  Decl., Ex. 5 (June 18, 2020 Goldman Supplemental Report ("Goldman Supp. Report")).  In that

17  report, Mr. Goldman found that the Buffum French Press showed the same scratches on the inside

18  of the beaker as he observed on the Grant French Press, which Mr. Goldman attributes to the

19  excessively tight fit of the plunger.  *Id.* at 1. Mr. Goldman also found that the Buffum French

20  Press was made "with the same thinner glass as the Grant Press."  *Id.*  Mr. Goldman opines that

21  Buffum, like M.G., was using his French press as intended.  *Id.*  He concludes that the Buffum

22  French Press fractured due to a glass manufacturing defect, namely, a "ring-off" defect.[6]  *Id.*

23  Moreover, he opines, the defect was easily visible on the glass of the Buffum French Press and

24  would have been visible at the time it was assembled, offering further support to Mr. Goldman's

25  opinion that Bodum does not have any quality testing program for the French presses it imports

26

---

27  [6] In his report, Mr. Goldman explains that "ring-off" is a defect that occurs during manufacturing characterized by a crack around the circumference of a glass vial that grows with use and severely weakens the glass, leading to fracturing.  *Id.* at 4-5. Plaintiff stipulated at oral argument that Mr.

28  Goldman does not contend the Grant French Press had a ring-off defect.

1    into the United States and does not monitor or react to defects in its products, though it is common

2    industry practice to do so.  *Id.* at 9.

3        While Dr. Ganot  agrees with Mr. Goldman that the Grant French Press fractured as a

4    result of internal pressure, he rejects Mr. Goldman's opinion that it broke as a result of a design

5    defect, opining that "[t]he failure mechanism put forth by [Mr. Goldman] is without scientific and

6    engineering basis."  Baghdadi *Daubert*/Summary Judgment Decl., Ex. 3 (Ganot Report) at 1.

7    According to Dr. Ganot, "calculations and testing" that he performed on "identical" French

8    presses indicate that "when used in accordance with the instructions," "the force required to break

9    the glass is far in excess than that generated by either the thermal expansion, the compression

10    action of the plunger against the beaker, or the combined action of these two phenomena."  *Id.* at

11    10;  *see also id.*  at 18 ("This test and subsequent calculation indicate that when undergoing

12    normal use conditions, the beaker is sufficiently capable of withstanding the loads generated by

13    the action of the plunger compressing the liquid/coffee.").

14        To reach this conclusion, Dr. Ganot conducted tests to determine the pressure that would

15    be caused by thermal expansion as hot water is poured into the beaker, heating the inner surface of

16    the glass more quickly than the external surface and causing stress for a brief period. Baghdadi

17    *Daubert*/Summary Judgment Decl., Ex. 3 (Ganot Report) at 10-13.  Dr. Ganot conducted tests to

18    measure the temperature gradient between the interior and exterior surface of the glass as boiling

19    water was poured into a room-temperature beaker and then used this data in conducting a finite

20    element analysis ("FEA") simulation to determine the stress on the beaker caused by thermal

21    expansion alone.  *Id.*  Dr. Ganot found that "the thermally induced stresses were approximately

22    812.2 psi [5.6 MPa]" while "[t]he tensile strength of the glass is 10,000 psi (69 MPa)."  *Id.* at 13.

23    He therefore concluded that "the thermal stress required to fracture the glass is approximately 12

24    times greater than the actual applied thermal stress" and "did not play a primary role in the

25    fracture."  *Id.*

26        Next, Dr. Ganot calculated the circumferential pressure related to the compression of the

27    steel mesh and spring of the plunger pressing against the side of the beaker as the plunger is

28    depressed.  *Id.*  at 13-15.  Dr. Ganot calculated the circumferential stress in the glass due to the

*United States District Court*
*Northern District of California*

9

United States District Court
Northern District of California

1    compression of the mesh and spring against the interior of the beaker to be 5.68 MPa whereas he

2    opined that the tensile strength of the glass was 69 MPa. *Id.* at 14.  Thus, he concluded, the stress

3    required to fracture the glass is approximately 12 times greater than the pressure exerted by the

4    compressed plunger. *Id.*  Dr. Ganot noted that if the circumferential stress at failure was 13,500

5    psi/93 MPa (rather than 69 MPa), as Mr. Goldman found,  the stress required to fracture the glass

6    would have been approximately 16 times greater than the pressure exerted by the compressed

7    plunger. *Id.*  Either way, he concluded, the circumferential pressure exerted by the plunger is

8    "minimal" and much less than the pressure required to fracture the glass.  *Id.*

9         After evaluating the thermal stress and the circumferential pressure separately, Dr. Ganot

10   conducted an analysis of the pressure that would be caused by a combination of these two forces,

11   using another FEA analysis. *Id.* at 15.   According to Dr. Ganot, even using conservative inputs

12   that gave rise to the highest levels of stress, the FEA analysis established that the two forces would

13   not be enough to cause the beaker to fracture; in particular, he found that the combined force was

14   only 11.4 MPa, that is, one sixth of the pressure that would have been required to fracture the

15   glass. *Id.*

16         Dr. Ganot went on to describe laboratory experiments he conducted related to thermal

17   shock and the longitudinal pressure that results from pushing down the plunger.  In the laboratory

18   experiments related to thermal shock, his experiments included pouring boiling water into a glass

19   beaker that was sitting in an ice bath, which did not result in any cracks or fractures.  *Id.*  He also

20   conducted experiments using a modified beaker to measure the longitudinal pressure associated

21   with pushing the plunger down as coffee is made. *Id.* at 17-20.  In conducting these tests, Dr.

22   Ganot used "course ground" coffee and pushed the plunger down "using the weight of one's

23   hand." *Id.* at 18.[7]  He found that the pressure generated by pushing the plunger down was only

24   3.89 psi (0.027 MPa) and thus "negligible" when compared to the pressure required to induce a

25   fracture. *Id.* at 18.  He noted that "anything that impedes plunger motion or leads to greater

26

27   ────────────────

28   [7] According to Dr. Ganot, the instructions for the Bodum French Press tell users to "apply slight
     pressure to the plunger and depress plunger slowly into the glass container" "[u]sing the weight of
     one's hand." *Id.* at 2.

United States District Court
Northern District of California

1  compression of the liquid, such as a clogged filter, will increase the pressure within the beaker and

2  thus the resulting hoop stress[8] in the beaker." *Id.* at 19.  He did not test the pressure that would be

3  generated by using fine ground coffee.

4      Dr. Ganot also rejects Mr. Goldman's opinion based on a 1956 design drawing produced

5  by Bodum that the design of Bodum's French Press was modified at some point to use thinner

6  glass. *Id.* at 21-25. He opines that the significance of the 1956 drawing is ambiguous as other

7  design diagrams from the same era reflect different dimensions and glass thicknesses (including

8  one that reflects a glass thickness of 1.5 mm.) and there is evidence that the design has changed

9  over the years. *Id.*   He also rejects Mr. Goldman's reliance on the existence of scratches on the

10  inside of the beaker of the Grant French Press to support his conclusion that the pressure of the

11  plunger caused the beaker to break. *Id.* at 26-27.  According to Dr. Ganot, Mr. Goldman's opinion

12  is not persuasive because he relied "solely on relatively low-magnification observation to reach

13  this conclusion" and "[t]hese scratches could have been formed by any number of mechanisms

14  (such as, during use by the end user), and further analysis is required to conclusively determine

15  that the steel mesh is the cause." *Id.*  at 26.

16      Dr. Ganot also disputes Mr. Goldman's opinion that injury claims spiked 1200% in 2018,

17  opining that Mr. Goldman got some of the injury dates wrong and noting that it is not clear that all

18  of the claims involved the Chambord model or the 8-cup size that is the subject of this action.  *Id.*

19  at 28.  Therefore, Dr. Ganot concludes, "the identification of such an extreme 'spike,' as set forth

20  by Mr. Goldman, is invalid." *Id.*  Dr. Ganot also points out that Mr. Goldman's opinion is flawed

21  because he does not take into account evidence that Bodum's sales increased in 2018. *Id.*  at 27.

22  Mr. Goldman's opinion is misleading, Dr. Ganot opines, because he did not consider the *rate* of

23  injury claims.  *Id.*

24      In his rebuttal report, Mr. Goldman contends Dr. Ganot's measurements of thermal

25  expansion and circumferential pressure do not support Dr. Ganot's opinion that Mr. Goldman's

26  theory of causation is invalid.  According to Mr. Goldman, "[s]tress from different sources is

27

28  _____

[8] Dr. Ganot defines "hoop stress" as the circumferential stress, *id.*  at 31 and explains that the longitudinal pressure is twice the hoop stress.  *Id.*  at 9, 17.

11

additive, and three stresses from different sources acting on the eventual origin were identified in [his] report including internal pressure from the liquid being pressed by the piston creating internal pressure, thermal expansion, and the outward compression due to the piston." *Rose Daubert* Opp. Decl., Ex. 8 (September 9, 2020 Goldman Rebuttal Report) at 2. Yet Dr. Ganot "ignored [Mr. Goldman's] frequent discussions of internal pressure and focused on the lowest two additive stresses that [he] identified, thermal stress and the tension caused by the compressed piston." *Id.* He further contends there were numerous flaws in Dr. Ganot's test methodology, including using "course grind" coffee without defining the term (according to Mr. Goldman, his investigation shows that the meaning of that term is unclear and varies widely, and that even coffee ground on a "course setting" includes some amount of fine ground coffee) and failing to provide the amount of downward force that was used to depress the plunger in his experiments and describing it only as the "weight of a hand" (Mr. Goldman notes that the weight of a hand varies widely, estimating that for a 91-pound girl, the weight of the hand is approximately .5 pounds as compared to 1.6 pounds for a 250 pound man). *Id.* at 5-8. Mr. Goldman also found that neither the weight of the hand of a 91-pound girl nor the weight of the hand of a 250-pound man was sufficient to depress the plunger of the Grant French Press. *Id.* at 9. In particular, he found using the Grant French Press that even to depress the plunger with no water in the beaker took 11 pounds of force. *Id.*

Mr. Goldman also criticizes Dr. Ganot's methodology on the basis that he did not take into account the accumulation of coffee grounds in the mesh screen that "inevitably occurs" with normal use, resulting in some plugging. *Id.* at 9-10. Because Dr. Ganot used exemplars that were brand new and had no such plugging, his approach is not consistent with sound engineering practices, Mr. Goldman contends. *Id.* at 10. Likewise, Mr. Goldman asserts, Dr. Ganot's methodology was flawed because he did not provide any information on "how the modified piston assembly including the stainless steel tube protruding into the liquid below the piston was leak tested and calibrated." *Id.* at 11. According to Mr. Goldman, "[l]eak testing would also be needed for the extra 'Tee' in the flexible tube which has one end plugged." *Id.* Also, Dr. Ganot did not "provide validation that the 2020 coffee press used in his test was representative of the coffee press that Mr. Grant purchased on October 28, 2017" with respect to glass thickness, glass inside

diameter, the uncompressed diameter of the piston, or the wire diameter of the compression spring. *Id.* at 11.

Mr. Goldman rejected Dr. Ganot's opinions questioning his reliance on the 1956 design drawing, pointing to the standards set forth in the NASA Engineering Drawing Standards Manual, which "differentiates between different types of drawings by the purpose and intended use of the drawings." *Id.* at 11. He identified specific features of the 1956 drawing to support his opinion that its intended use was to provide the information necessary to fabricate the Bodum French Press, contrasting it with features of the undated drawing cited by Dr. Ganot to suggest that the Bodum French Press was designed to have a thickness of 1.5 mm. *Id.* at 11-16.

Mr. Goldman disagreed with Dr. Ganot's criticism of his observation of scratches on the inside of the Grant French Press based on his failure to use a Scanning Electron Microscope, describing his experience over many years of evaluating such scratches to determine the cause of bottle failures. *Id.* at 16-18. With respect to Dr. Ganot's opinion that the magnitude of the spike in complaints calculated by Mr. Goldman was exaggerated, Mr. Goldman opined that even accepting the dates for the complaints used by Dr. Ganot (which resulted in the complaints at issue being stretched out over a slightly longer period of time), there was still an increase in complaints around 2018 that should have triggered a reaction and recall by Bodum. *Id.* at 18-19.

Finally, Mr. Goldman rejected Dr. Ganot's opinion that his methodology was unscientific because he did not conduct tests to measure the forces that caused the Grant French Press to fracture during use. *Id.* at 20-25. According to Mr. Goldman, "the science of glass fracture analysis for pressure failures of cylindrical containers is well documented with pictures or sketches, and the photographs posted online by consumers of their broken Bodum Coffee Presses could be used as substitutes for those pictures or sketches." *Id.* at 20. He further opines that "[t]he easily identified glass fracture pattern for an internal pressure failure on a sidewall has been well known dating back to at least 1939." *Id.* Moreover, he opines, it "is standard industry practice" to view photographs of broken glass containers as part of the process of evaluating the cause of the failure. *Id.* at 25.

13

United States District Court
Northern District of California

**B.     Procedural Background**

**1. The Complaint**

On January 16, 2019, M.G. initiated this product liability action in San Francisco Superior Court, asserting the following claims: 1) design defect (strict liability); 2) manufacturing defect (strict liability); 3) negligence; 4) failure to warn (strict liability and negligence); 5) breach of implied warranty; and 6) failure to recall/retrofit.  Bodum removed the action to this Court on February 27, 2019 under 28 U.S.C. § 1441(a) on the basis of diversity jurisdiction.  Although M.G. originally demanded a jury trial, the parties agreed to a bench trial in light of the limitations on the Court's ability to conduct jury trials during the current public health emergency in order to expedite the trial.  *See* Dkt. No. 61.  A bench trial in this case is scheduled to commence on May 3, 2021.  In the pending motions, described below, both parties seek to exclude the testimony of the other side's expert and request that the Court enter summary judgment (or partial summary judgment) in their favor.

**2.     Plaintiff's *Daubert*/Summary Judgment Motion**

Plaintiff argues that Dr. Ganot's opinions should be excluded under Rule 702 of the Federal Rules of Evidence and *Daubert*  because they are unreliable and shed no light on the only relevant issue that is in dispute, namely, whether the Grant French Press failed as a result of *unforeseeable* misuse.  Plaintiff's *Daubert*/Summary Judgment Motion at 1-2.  Plaintiff further contends the Court should grant summary judgment in her favor with respect to her design and manufacturing defect claims because Bodum has failed to raise a triable issue of fact that the conduct of M.G. or anyone else constituted unforeseeable misuse.  *Id.* at 11.

Plaintiff challenges the reliability of Dr. Ganot's opinions on the basis that in performing tests to quantify the forces that contributed to the internal pressure in the Grant French Press (thermal expansion, the outward pressure of the piston and the downward pressure caused by depressing the piston), Dr. Ganot used "approximately 20 exemplar devices provided by defense counsel" but did "nothing to establish that his work on exemplar devices [was] in any way applicable to what happened with the Grant [French Press]."  *Id.* at 4-5, 14.  Plaintiff points to Dr. Ganot's deposition testimony that he did not know if the exemplars he tested were made to the

United States District Court
Northern District of California

1    same specifications as the Grant French Press. *Id.* at 4 (citing Ganot Dep. at 163-164). Plaintiff

2    further contends the uncontroverted evidence shows that the exemplars were *not* the same as the

3    Grant French Press. Among other things, Plaintiff points to evidence that the circumference of the

4    uncompressed mesh of the testing exemplars used by Dr. Ganot fluctuated between 94.02 and

5    95.33 mm. whereas the mesh of the Grant French Press was 97.72 mm. *Id.* at 5 (citing Baghdadi

6    *Daubert*/Summary Judgment Decl., Ex. 4 (Ganot Dep.) at 111-112). She also points to evidence

7    of the variability in the inner diameter of the exemplars, noting that whereas Mr. Goldman

8    measured the inner diameter of the Grant French Press beaker as 91.35 mm., Dr. Ganot recorded

9    varying inner diameters of four exemplars (ranging from 91.26 mm. to 92.08 mm) and did not

10   provide information about the measurements of the specific exemplars he used for each test. *Id.*

11   (citing Baghdadi *Daubert*/Summary Judgment Decl., Ex. 5 (Goldman Report) at 10).[9]

12        Plaintiff further contends that the testing and calculations Dr. Ganot performed do not meet

13   the "fit" requirement of *Daubert* because he only tested the internal pressure that results from

14   "normal use," that is, if the user follows all of the instructions for making coffee with the Bodum

15   French Press. *Id.* at 11. Yet he offered no opinion about what *actually* caused the

16   overpressurization of the Grant French Press, Plaintiff asserts, testifying only that it was caused by

17   "some unknown factor, unknown variable." *Id.* at 12 (citing Baghdadi *Daubert/*Summary

18   Judgment Decl., Ex. 4 (Ganot Dep.) at 14). Plaintiff points out that Dr. Ganot repeatedly testified

19   at his deposition that he had no data as to the specific cause of the overpressurization and declined

20   to offer an opinion as to how M.G. or her family could have misused the Grant French Press in a

21   manner that could have caused it to fail as it did. *Id.* at 12-13 (citing Baghdadi *Daubert*/

22   Summary Judgment Decl., Ex. 4 (Ganot Dep.) at 15 ("the physical evidence indicates that there

23   was an application of pressure on the beaker such that it exceeded tensile strength. And how that

24   application of pressure occurred is something that I don't have enough data to -- to opine on.")).

25        According to Plaintiff, Dr. Ganot had no opinion as to whether the failure of the Grant

26   French Press was caused by failing to follow the instructions, pushing the plunger down too fast

27   _____

28   [9] Although Plaintiff does not provide a citation for Dr. Ganot's measurements, they are found in
     Dr. Ganot's file. *See* Baghdadi *Daubert*/Summary Judgment Decl., Ex. 6.

1    or something else the family did.  *Id.* at 12 (citing Baghdadi *Daubert/*Summary Judgment Decl.,

2    Ex. 4 (Ganot Dep.) at 14, 61, 68, 109, 131).   Indeed, Plaintiff points out, when Dr. Ganot was

3    asked how the Grant family had misused the French Press, he expressly disavowed the word

4    "misuse."  *Id.* at 12 (citing Baghdadi *Daubert/*Summary Judgment Decl., Ex. 4 (Ganot Dep.) at

5    134 ("I'm not using the word 'misuse.' What I'm saying is that the normal -- the use cases that we

6    defined, which I'm calling normal use in conjunction with the instructions and the physical nature

7    of the failure . . . indicate that something beyond that caused what is likely overpressurization

8    resulting in a fracture. What, specifically, the family did or didn't do, I don't have an answer for

9    that.").  Plaintiff argues that because it is undisputed that the Grant French Press broke due to

10   overpressurization and Dr. Ganot's opinions shed no light on *why* it broke, his opinions will not be

11   helpful and therefore should be excluded.  *Id.*  at 13.

12          Plaintiff further contends Dr. Ganot's  opinions based on "normal use" should be excluded

13   because this is not the applicable standard under California law, which requires that consumer

14   products must be safe "even when foreseeably misused or used in a manner that is not in full

15   compliance with the product's instructions (or that an effective warning be issued)."  *Id.* at 9-10,

16   14-15.  According to Plaintiff, Dr. Ganot does not account in any way for what percentage of

17   coffee press users follow the written instructions and he conceded at his deposition that he has no

18   expertise as to how reasonable consumers use the Bodum French Press.  *Id.* at 13-14 (citing

19   Baghdadi *Daubert/*Summary Judgment Decl., Ex. 4 (Ganot Dep.) at 38-39, 73-74, 123, 138, 147-

20   148).  Nor was he able to offer any opinion as to whether the Grants did, *in fact*, follow the

21   instructions, Plaintiff contends (as discussed above).  *Id.* at 15.

22          For the same reasons Plaintiff asks that Dr. Ganot's opinions be excluded under Rule 702

23   and *Daubert*, she also contends the Court should enter summary judgment in her favor on her

24   strict liability claims based on design and manufacturing defects.  *Id.*  at 11.

25              **3.    Defendant's *Daubert* Motion**

26          Bodum asserts that Mr. Goldman's opinions should be excluded under Rule 702 and

27   *Daubert* because he "failed to measure, calculate, or otherwise evaluate any of the stresses he

28   contends combined to cause the Subject Press to fracture" and did not conduct any testing on the

Bodum French Press.  Defendant's *Daubert* Motion at 2.  Therefore, Bodum asserts, Mr. Goldman's opinions are "in no way the product of sound science, engineering, or failure analysis methodologies."  *Id.*

First, Bodum contends that Mr. Goldman's primary opinion – that the Grant French Press fractured due to a combination of thermal expansion, circumferential pressure and downward pressure – is based on forces that are measurable but that Mr. Goldman made no attempt to conduct any testing to determine if these forces actually resulted in stress sufficient to account for the failure of the Grant French Press.  *Id.* at 7-9.  Instead of offering data to support his theory of causation, Bodum asserts, Mr. Goldman "falls back on assorted references to (1) scratches on the inside of the glass carafe, (2) a 1956 technical drawing, (3) reports of other incidents involving a Bodum French Press, and (4) an unsupported conclusion that there was no abuse or misuse of the product."  *Id.* at 9 (citing Wheeler *Daubert* Decl., Ex. I (Goldman Report) at 1).  According to Bodum, none of these "peripheral issues" makes Mr. Goldman's "unscientific opinions" admissible.  *Id.*

Bodum contends Mr. Goldman should be prohibited from offering testimony about scratches on the inside of the Grant French Press as a cause of its failure because he admitted in his report that scratches were not the "root cause" of the break.  *Id.*  at 9 (citing Wheeler *Daubert* Decl., Ex. I (Goldman Report) at 10).  Therefore, Bodum asserts, the scratches Mr. Goldman observed are irrelevant.  *Id.*  Further, it contends, to the extent Mr. Goldman speculated at his deposition that "micro-scratches" could have weakened the tensile strength of the glass of the Grant French Press over time, that testimony is inadmissible because Mr. Goldman also testified that he did not see micro-scratches on the Grant French Press.  *Id.* (citing Wheeler *Daubert* Decl., Ex. A (Goldman Dep.) at 101-102).

Bodum also argues that Mr. Goldman should be precluded from offering opinions related to a purported design change involving the use of thinner glass to make the glass beaker that he opines resulted in a weakening of the strength of the glass.  *Id.* at 10-11 (citing Wheeler *Daubert* Decl., Ex. I (Goldman Report) at 13-19).  According to Bodum, this opinion is based on a 1956 design drawing and lacks "foundation and historical context." *Id.*  Furthermore, Bodum asserts,

17

Mr. Goldman did not perform any tests to determine the ability to withstand internal pressure of a glass beaker with a 2.5 mm. thickness (the thickness of the 1956 design). *Id.* Bodum argues further that to the extent that Mr. Goldman opines that Bodum changed its design at some point to reduce the thickness of the glass used in the beaker to 1.5 mm., he also never tested the amount of internal pressure such a beaker could withstand. *Id.* at 10-11 (citing Wheeler *Daubert* Decl., Ex. A (Goldman Dep.) at 145, 150, 151, 154, 176). Moreover, Bodum contends, Mr. Goldman did not evaluate other French presses on the market and has no basis to opine as to what thickness is standard in the industry or whether the 2.0 mm.[10] thickness of the glass used in the Grant French Press comports with the industry standard. *Id.* at 11.

Bodum also contends Mr. Goldman's opinions that Bodum has a "quality issue" and that its French presses have a "safety defect" should not be considered to the extent he relies on complaints about Bodum French presses he found on Amazon and "a small number of consumer claims made to Bodum between 2012 and 2019." *Id.* at 11 (citing Wheeler *Daubert* Decl., Ex. I (Goldman Report) at 26). According to Bodum, with the exception of the Buffum claim, Mr. Goldman did not attempt to verify that the information in the claims was accurate and he did not talk to the individuals who made the claims or examine the French presses they used. *Id.* at 11-12 (citing Wheeler *Daubert* Decl., Ex. A (Goldman Dep.) at 247, 250). As to some claims, Bodum contends, it also is not clear that the individuals were using the same model as the Grant French Press. *Id.* Bodum further asserts that Mr. Goldman's reliance on the Buffum claim is "illogical" as he opines in his supplemental report that the Buffum French Press failed as the result of a

[10]In his report, Mr. Goldman opined as follows: "The glass sidewall thickness of the incident Coffee Press was measured at 45° increments around the glass vessel at the top, Middle, and Bottom of the sidewall during the inspection, and those measurements which averaged 1.94 -mm are found in the table below. This indicates that the borosilicate tube used to manufacture the glass vessel was 1.94 -mm thick." Wheeler *Daubert* Decl., Ex. I at 14. The chart containing the specific measurements that Mr. Goldman took to obtain this average thickness shows that the glass at the bottom of the beaker was thicker than at the middle and top, with thickness ranging from 2.06 to 2.12. *Id.* at 15. Citing these measurements, Bodum states that "as Mr. Goldman measured himself, the thickness of the glass in the Subject Press is approximately 2.0 mm, not 1.5 mm." Defendant's *Daubert* Motion at 10. In a footnote, Bodum appears to justify its characterization of Mr. Goldman's measurements as giving rise to a thickness of 2.0 mm. rather than 1.94 based on the fact the glass at the bottom of the carafe, where it fractured, was thicker than the average. *Id.* n. 8. Bodum does not offer a scientific basis for using the 2.0 figure to describe Mr. Goldman's finding as to the thickness of the Grant French Press.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

manufacturing defect whereas in his opening report he opines that the Grant French Press failed due to a design defect. *Id.* (citing Wheeler *Daubert* Decl., Ex. N (Goldman Supplemental Report) at 1).

Bodum asserts Mr. Goldman's opinion that there are safer alternatives to a design that uses a glass beaker should be excluded because "[t]he mere existence of French Presses that use plastic or steel carafes, including those sold by Bodum, does not prove that French Presses that use glass carafes, as many do, are per se defective." *Id.* at 13. It also argues that Mr. Goldman's opinions about the adequacy of the warnings that came with the Grant French Press should be excluded because his warning opinions are not based on any expertise related to the adequacy of warnings or on independent research. *Id.* at 14-16.

Bodum argues that Mr. Goldman's reliance on the number of broken glass claims in 2018 in support of his opinion that Bodum should have monitored the safety performance of its product and reacted is not supported by any legal or industry standard. *Id.* at 17. In particular, it asserts that the 8 broken glass claims from 2018 are "unsubstantiated" and that in any event, these claims represent a claim rate of only 0.001918%. *Id.* Further, Bodum contends, Mr. Goldman's experience at Coca Cola Company does not qualify him to offer opinions about when a company's duty to investigate safety complaints and take action is triggered. *Id.* at 18. Bodum points out that unlike the Coca Cola Company, which is a manufacturer, Bodum is a distributor and questions Mr. Goldman's opinion that because it is an importer it has the same safety obligations as a manufacturer. *Id.* at 18. Bodum also contends Mr. Goldman's opinions about the adequacy of its response are improper to the extent he relies on CPSC requirements, arguing that his opinions constitute legal conclusions, which experts are not permitted to offer. *Id.*

Bodum also takes issue with what it contends are "inflammatory and derogatory comments" by Mr. Goldman, including his opinions that: 1) Bodum has an "attitude" of "prioritizing aesthetics ahead of consumer safety[;]" 2) "despite ... knowledge that poor quality manufacturing or damage during shipping creates a safety risk ..., Bodum blindly sells whatever is shipped to them from Portugal[;]" and 3) Bodum "ignore[s] individual victims." *Id.* at 18 (citing Wheeler *Daubert* Decl.., Ex. I (May 20, 2020 Goldman Report) at 23, 30, 39. Similarly, Bodum

19

objects to Mr. Goldman's opinion in his rebuttal expert report that "there is no safety culture at Bodum." *Id.* (citing Wheeler *Daubert* Decl., Ex. F (September 9, 2020 Goldman Rebuttal Expert Report) at 25. According to Bodum, these are simply improper legal conclusion that should not be permitted. *Id.* at 19.

### 4.   Defendant's Summary Judgment Motion

Bodum contends it is entitled to summary judgment with respect to all of Plaintiff's claims because "there is no competent, admissible evidence in the record that the [Grant French Press] fractured due to any aspect of its design, manufacture, or normal foreseeable use." Defendant's Summary Judgment Motion at 1.  According to Bodum, to meet this burden Plaintiff must offer the opinion of an "experienced and trained expert[ ]" who has conducted "a scientific and engineering inquiry, involving measurements, calculations, and failure analyses." *Id.*  The importance of such an inquiry is particularly important, Bodum contends, because the case involves an "iconic" product that was used for three months before fracturing and was being used by an "unsupervised child" when it fractured.  *Id.*  Because Mr. Goldman's opinions are not admissible (for the reasons discussed above), Bodum contends, Plaintiff cannot establish the existence of a design defect or a defect based on inadequate warnings or instructions.  *Id.*  at 2. Bodum argues that it is entitled to summary judgment on Plaintiff's claims for other reasons as well, as set forth below.

With respect to Claim One (Design Defect (Strict Liability)), Bodum contends the claim is governed by the risk-benefit test rather than the consumer expectation test for determining whether there is a design defect.  *Id.* at 10, 12-15.   Bodum argues that because expert testimony is a prerequisite for establishing a design defect under the risk-benefit test and Mr. Goldman's opinions are subject to exclusion under Rule 702 and *Daubert*, this claim fails as a matter of law. *Id*. at 10,15.  Bodum argues in a footnote that "[e]ven if the consumer expectations test did apply, Plaintiff still cannot establish the causation element of such a claim due to a lack of competent expert testimony showing the [Grant French Press] fractured due to some actionable conduct on the part of Bodum, as opposed to some action beyond Bodum's control."  *Id.* at 10 n. 11.

With respect to Claim Two (Manufacturing Defect (Strict Liability)), Bodum contends it is

1   entitled to summary judgment because Mr. Goldman "agrees there is no manufacturing defect" in

2   the Grant French Press.  *Id.* at 11, 16.  Therefore, Bodum asserts, the claim fails for lack of

3   evidence.

4          In Claim Three, Plaintiff alleges that Bodum is negligent in "design, manufacture,

5   testing, distribution, marketing, sale and failure to recall."  With respect to negligent design,

6   Bodum argues that the claim should be dismissed for the same reasons Claim One falls short.  *Id.*

7   at 18.  As to the negligence theory based on failure to recall, Bodum argues the claim fails for the

8   same reasons Claim Six is deficient, discussed below.   Bodum contends the negligent

9   manufacturing claim fails because there is no evidence of a manufacturing defect (as discussed in

10  connection with Claim Two).  *Id.*   Nor has Plaintiff offered any evidence of negligent testing, sale

11  or marketing, Bodum contends.  *Id.*  Bodum further asserts that the negligence claim fails because

12  there is no admissible evidence of a defect that caused Plaintiff's injuries or that any alleged defect

13  was the result of Bodum's negligence.  *Id.*  In particular, Bodum argues that there is no evidence

14  of what a reasonable seller would do under similar circumstances.  *Id.*

15         Bodum contends it is entitled to summary judgment on Claim Four (Failure to Warn)

16  because the undisputed evidence establishes that Plaintiff's parents, to whom the warnings were

17  directed, did not read the instructions that came with their French Press and therefore, Plaintiff

18  cannot prove that any shortcoming with respect to the warnings that came with the product was a

19  proximate cause of Plaintiff's injury.  *Id.*  at 11, 16-18. Bodum also contends the undisputed

20  evidence establishes that the Grants knew that the glass beaker of their French Press might break

21  based on their past experience and therefore cannot establish that additional or different warnings

22  would have caused them to act differently.  *Id.* at 17-18.

23         In Claim Five, Plaintiff alleges that Bodum breached an implied warranty that the Grant

24  French Press was suitable for a particular purpose, "namely, for making coffee by pressing the

25  Device's plunger downward after the Device was filled with hot water and ground coffee."

26  Complaint ¶¶ 48-54.  According to Bodum, "[f]or an implied warranty claim under UCC 2-315,

27  the 'particular purpose' contemplated by the purchaser must be different from the product's

28  ordinary purpose and must be known or knowable to the seller."  Defendant's Summary Judgment

United States District Court
Northern District of California

1    Motion at 19 (citing *Houghtailing v. Crown Equip. Corp.*, No. 11-CV-05040-TEH, 2015 WL

2    1090386, at *2 (N.D. Cal. Mar. 12, 2015)).  Bodum contends Plaintiff has not alleged any

3    particular purpose that satisfies this requirement, or presented any evidence of such purpose.  *Id.* It

4    further asserts that the claim fails because the Grants purchased the Bodum French Press from

5    Macys rather than from Bodum and therefore, Bodum had no awareness of any implied warranty

6    that might have arisen.  *Id.* at 19-20.  Bodum further asserts that no such warranty on Bodum's

7    party could have arisen.  *Id.*

8            Bodum argues that Claim Six fails because a claim for failure to recall requires that the

9    plaintiff establish the existence of a defect that was the cause of the product's failure and Plaintiff

10   cannot meet that requirement, as discussed above.  *Id.* at 20. In addition, Bodum asserts, Plaintiff

11   cannot establish that Bodum knew that its product was dangerous as the injury claims cited by Mr.

12   Goldman were unsubstantiated and represented a very low percentage of sales.  *Id.* at 20-21.

13   **III.    ANALYSIS**

14       **A.    The *Daubert* Challenges**

15           **1.    Legal Standards Under Federal Rule of Evidence 702 and *Daubert***

16           Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if

17   the following requirements are met:

18       (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact

19       to understand the evidence or to determine a fact in issue;

20       (b) the testimony is based on sufficient facts or data;

21       (c) the testimony is the product of reliable principles and methods; and

22       (d) the expert has reliably applied the principles and methods to the facts of the case.

23   Fed. R. Evid. 702.  In determining whether expert testimony meets the requirements of Rule 702,

24   courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the

25   Supreme Court described the relevant inquiry as follows:

26           Faced with a proffer of expert scientific testimony, then, the trial
            judge must determine . . . whether the expert is proposing to testify to
27          (1) scientific knowledge that (2) will assist the trier of fact to
            understand or determine a fact in issue.  This entails a preliminary
28          assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id*. (quoting Webster's Third New International Dictionary 1252 (1986)).   The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met.  *Id*. at 593.  These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or potential rate of error; and 4) the degree of acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 592-94.

The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review."  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").  However, when such evidence is not available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how they went about reaching their conclusions and point[ing] to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field."  *Id*.  at 1319.

The second requirement under Rule 702, that expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue," "goes primarily to relevance."  *Id*. at 591.  This is a question of "fit," and "is not always obvious."  *Daubert*, 509 U.S. at 591.  The Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  *Id*.  To meet this requirement there must be "a valid scientific

23

connection to the pertinent inquiry." *Id*. In other words, the expert testimony must "logically advance[ ] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. This requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of Evidence, "reflecting the special dangers inherent in scientific expert testimony." *Jones v. U.S.*, 933 F. Supp. 894, 900 (N.D. Cal., 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at 1321 n. 17). In particular, expert testimony "'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id*. (quoting *Daubert*, 509 U.S. at 595 (citation omitted)). "Therefore, a federal judge should exclude scientific expert testimony under the second prong of the *Daubert* standard unless he is 'convinced that it speaks clearly and directly to an issue in dispute in the case.'" *Id*. (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

"[A] major principle underlying the Daubert gatekeeping function is that the trier of fact should not be unduly prejudiced by testimony that is based on foreign concepts." *Volk v. United States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999); *see also Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007) ("In *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court described the district court's 'gatekeeping role,' and required that 'all forms of expert testimony, not just scientific testimony' survive scrutiny under Rule 702.") (quoting *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th Cir. 2002)). "However, the gatekeeping function is less pressing where . . . the Court sits as the trier of fact in place of a jury." *United States v. E. Mun. Water Dist*., No. CV 04-8182 CBM(RNBX), 2008 WL 4755373, at *1 (C.D. Cal. Apr. 7, 2008) (citing *Volk v. United States*, 57 F.Supp.2d at 896; *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000); *Vatyan v. Mukasey*, 508 F.3d 1179, 1187 (9th Cir. 2007)); *see also Turner Const. Co. v. Nat'l Am. Ins. Co*., No. C-03-1227 SBA, 2004 WL 6066675, at *2 (N.D. Cal. Sept. 20, 2004) ("'[M]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury.'")(quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000)).

### 2.   M.G.'s *Daubert* Challenges

Plaintiff's *Daubert* challenges fall into two categories: those that attack the reliability of Dr. Ganot's findings and those that challenge his opinions on the basis of "fit." As to the former,

the Court concludes that Plaintiff's arguments go to the weight that should be given to Dr. Ganot's opinions rather than to their admissibility.  Plaintiff's primary argument is that Dr. Ganot's findings are unreliable because he used exemplars that are not identical to the Grant French Press. The French presses that Dr. Ganot tested were similar, though not identical to the Grant French Press.  In addition, Dr. Ganot appears to have accounted for variations when he incorporated his test results in the FEA he conducted, including adopting the most conservative values possible to determine the stress caused by thermal expansion, circumferential pressure and downward pressure.  This is sufficient to satisfy the requirements of Rule 702.  To the extent there were variations among the exemplars or differences between the exemplars and the Grant French Press that may diminish the probative value of Dr. Ganot's findings, those are issues that  "are more appropriately addressed through cross-examination and/or the presentation of contrary evidence." *Kim v. Crocs, Inc*., No. CV 16-00460 JAO-KJM, 2018 WL 6435326, at *6 (D. Haw. Dec. 7, 2018) (citing *Daubert*, 509 U.S. at 596).

The remainder of Plaintiff's challenges are based on the contention that Dr. Ganot's opinions do not meet the "fit" requirement of Rule 702 and *Daubert*.  First, Plaintiff points to Dr. Ganot's consistent refusal to offer any affirmative testimony that the Grant French Press failed as a result of misuse.  While this may be relevant to the merits of Bodum's misuse defense, it is not a sufficient basis for excluding the opinions Dr. Ganot *did* offer.  As the Ninth Circuit has explained, "not every expert need express, nor even hold, an opinion with regard to the issues involved in a trial . . . . Rather, the key concern is whether expert testimony will assist the trier of fact in drawing its own conclusion as to a 'fact in issue.'"  *United States v. Rahm*, 993 F.2d 1405, 1411 (9th Cir. 1993).

As to the opinions Dr. Ganot did offer, Plaintiff argues that the "fit" requirement is not met because Dr. Ganot tested the exemplars only to determine the forces that could lead to overpressurization when the Bodum French Press is used in a manner that is consistent with the instructions whereas the applicable legal standard looks to whether products are safe even when misused so long as the misuse is foreseeable.  *See Wright v. Stang Mfg. Co*., 54 Cal. App. 4th 1218, 1235 (1997) ("[T]he law now requires a manufacturer to foresee some degree of misuse and

abuse of his product, either by the user or by third parties, and to take reasonable precautions to minimize the harm that may result from misuse and abuse." (internal quotation and citation omitted)).  Plaintiffs point out that Dr. Ganot did not test the pressure that would result from using fine ground coffee, pushing the plunger down too quickly or any other misuse that might result in the carafe fracturing during use.  Bodum's theory, however, is that Dr. Ganot's findings with respect to the functioning of the Bodum French Press when used according to the instructions is probative of whether the Grant French Press was misused because it rules out certain explanations for the fracture.  It is not obvious to the Court based on the current record that Dr. Ganot's opinions will not be helpful to the Court's decision as to the existence of a defect and/or whether the Grant French Press was misused, despite his failure to conduct tests to measure the effects of any foreseeable misuses.  Therefore, the Court denies Plaintiff's request to exclude Dr. Ganot's opinions on this basis without prejudice to raising the issue again at trial.  *See Sumotext Corp. v. Zoove, Inc.,* No. 16-CV-01370-BLF, 2020 WL 533006, at *1 (N.D. Cal. Feb. 3, 2020) (observing that "[i]n many instances . . . rulings 'should be deferred until trial, so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context.'" (quoting *United States v. Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016)).

For the reasons stated above, the Court DENIES Plaintiff's request to exclude the opinions of Dr. Ganot.

### 3.   **Bodum's *Daubert* Challenges**

Bodum brings *Daubert* challenges to the opinions of Mr. Goldman on the following subjects: 1) the internal pressure that Mr. Goldman opines caused the Grant French Press to fracture; 2) the scratches Mr. Goldman observed on the inside of the beaker; 3) the decrease in the wall thickness of the Bodum French Press as compared to early design drawings; 4) evidence of other incidents in which the Bodum French Press failed, as reflected in reviews on Amazon.com and complaints made directly to Bodum; 5) the existence of safer alternative designs; 6) the adequacy of the warnings in the instructions that came with the Grant French Press; and 7) whether Bodum acted reasonably when it failed to issue a recall or make a report to the CPSC when the number of claims involving its product increased in 2018.  Plaintiff has stipulated that

1    Mr. Goldman will not offer opinions about the adequacy of the warnings at trial and therefore that

2    challenge is moot.  *See* Opposition to Defendant's *Daubert* Motion at 17. The Court addresses the

3    remaining challenges below.

                    a.   Causation Opinion

5        Bodum contends Mr. Goldman's opinions about the causation of the fracture are not

6    reliable because he made no attempt to quantify the forces that he contends led to

7    overpressurization, namely, the circumferential pressure, the downward pressure of the plunger

8    and pressure caused by thermal expansion.  The Court rejects this argument.  While Mr. Goldman

9    did not attempt to quantify the magnitude of these force, he applied scientific methods, including

10   measurements of the Grant French Press and analysis of the fracture pattern, to calculate the

11   pressure at the time of fracture.  Bodum does not dispute that Mr. Goldman's analysis based on his

12   examination of the Grant French Press applied accepted scientific principals and indeed, Dr. Ganot

13   also relied on the fracture pattern on the Grant French Press in support of his conclusion that the

14   glass fractured due to overpressurization.  *See* Wheeler *Daubert* Decl., Ex. D (Ganot Report) at 9

15   (opining that "overall fracture morphology is consistent with an 'overpressurization.'"). The fact

16   that Mr. Goldman did not conduct tests comparable to the ones Dr. Ganot conducted does not

17   render his opinions with respect to causation unreliable and therefore subject to exclusion.  Rather,

18   this challenge goes to the weight of the evidence and the issues Bodum raises can be addressed

19   through cross-examination and/or the testimony of Bodum's own expert.

20                   b.   Scratches

21       Bodum argues that Mr. Goldman should be precluded from testifying about internal

22   scratches he observed on the Grant French Press because Plaintiff concedes that the scratches did

23   not cause the beaker to fracture and therefore, this testimony is irrelevant.  To the extent this

24   challenge is based on a lack of "fit" under *Daubert*, the Court finds that it lacks merit.  Mr.

25   Goldman relied on the scratches that he observed on the Grant French Press to support his opinion

26   that the large diameter of the plunger exerted significant internal pressure on the beaker, not to

27   show that the scratches actually caused the beaker to fracture.  The Court rejects this challenge.

28

United States District Court
Northern District of California

c.   Wall thickness

Bodum questions Mr. Goldman's reliance on a 1956 design drawing produced by Bodum to opine that the glass beaker used in the French Press was designed to be 2.5 mm. thick, asserting he is "speculating" that the thickness of Bodum's French press beakers was 2.5 mm. at one time. The Court rejects Bodum's challenge.  As Mr. Goldman explains in his rebuttal report, his conclusion that the 1956 drawing is a "detail drawing" (that is, a drawing that shows all the information necessary for fabricating an item) is based on his experience as an engineer and relies on the NASA Engineering Drawing Standards Manual, which differentiates between different types of drawings by the purpose and intended use of the drawings. *See* Rose *Daubert* Opposition Decl., Ex. 8 (Goldman Rebuttal Report) at 11.  He also points out that Bodum did not produce any more recent detail drawings of its 8-cup French Press.  *Id.*  This lays a sufficient foundation for Mr. Goldman's opinion that the Bodum French Press was designed to be 2.5 mm. thick.[11]

The Court also rejects Bodum's argument that Mr. Goldman's opinions about the diminished strength of thinner glass beakers should be excluded because he did not test the strength of a beaker with 2.5 mm. glass thickness or study the thickness of other French presses on the market to determine their thickness.  In his report, Mr. Goldman relies on information about glass tolerance and recommended thickness contained in a technical manual from Schott (the manufacturer of the glass cylinders Bodum uses for its French presses), which includes a formula to calculate recommended wall thicknesses in proportion to different diameter glass tubes. Wheeler *Daubert* Decl., Ex. I (May 20, 2020 Goldman Report) at 16-18.  The Court therefore concludes that Mr. Goldman's opinion that use of thinner glass decreased the strength of the beaker by 30% meets the requirements of *Daubert* and Rule 702.

d.   Other incidents

Bodum contends Mr. Goldman's opinions about the adequacy of its response to what he

---

[11]Bodum also argues that Mr. Goldman speculates when he opines that the design was changed to reduce the thickness to 1.5 mm.  However, the Court does not find any such opinion in Mr. Goldman's reports.  Rather, Mr. Goldman opines that the Bodum French Press was designed to be 2.5 mm. thick and that the 1.94 mm. thickness of the Grant French Press reflects a change in the design to use thinner glass.

United States District Court
Northern District of California

1    found was an increase in safety complaints should be excluded because the underlying claims are

2    hearsay and the incidents on which they are based are not substantially similar.   This evidentiary

3    challenge is more appropriately raised at trial rather than as a *Daubert* challenge.

4        "Evidence of other accidents in products liability cases is relevant to show notice to the

5    defendant of the danger, to show existence of the danger, and to show the cause of the accident."

6    *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1268 (7th Cir. 1988) (citations omitted).

7    Courts require that the proponent of such evidence lay a foundation that the other accidents

8    involved substantially similar circumstances and may exclude such evidence on the basis of lack

9    of relevance under Rule 402 of the Federal Rules of Evidence and/or undue prejudice under Rule

10   403.  *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 457 (7th Cir. 2000).  As the court in *Nachtsheim*

11   observed, the requirement that other accidents must have occurred under similar circumstances is

12   particularly important where the evidence is used to establish that the product at issue has a

13   dangerous defect.  847 F.2d at 1268-1269.  This is because of the danger that a jury will rely on

14   these other accidents to conclude that the product at issue is unsafe – a conclusion that may be

15   unsound if the circumstances of the other accidents are not substantially similar.  *Id.*

16       Here, Mr. Goldman relies on the number of accident claims involving broken beakers to

17   establish that Bodum was on  notice of the need to investigate the safety of its French Press while

18   he performed a more detailed analysis of the Buffum accident (including examination of the

19   beaker that broke in that case) to offer opinions that may also have implications for the

20   dangerousness of the product at issue in this case.  The Court concludes as a general matter that

21   the burden required to lay a foundation for introducing evidence of an increase in the number of

22   injury claims to establish notice is likely to be lower than it would be for introducing evidence of

23   other accidents to show the dangerousness of the Grant French Press. *See Pennsylvania Tr. Co. v.*

24   *Dorel Juvenile Grp., Inc.*, 851 F. Supp. 2d 831, 842 (E.D. Pa. 2011) ("The 'substantial similarity'

25   test Plaintiff references applies differently to statistical evidence.").  However, the foundation that

26   must be laid in order to allow for the introduction of evidence of other accidents is a determination

27   that is more appropriately addressed at trial, when the Court will be in a better position to evaluate

28   the similarity of the circumstances of the accidents, the specific opinions being offered, and the

United States District Court
Northern District of California

1   purpose for offering the opinions. The Court notes that to the extent that exclusion of evidence

2   relating to other accidents  is often based on the danger that the jury will be misled, that concern is

3   not present here as the Court will be conducting a bench trial and is well-equipped to evaluate the

4   probative value of other accidents with respect to whether they put Bodum on notice of a duty to

5   investigate or recall and the dangerousness of the Grant French Press.

6       Therefore, the Court denies Bodum's request to exclude Mr. Goldman's opinions about

7   other accidents without prejudice to Bodum asserting evidentiary objections relating to those

8   opinions at trial.

9       e.   Safer alternative designs

10      Bodum argues that Mr. Goldman's opinions about the existence of safer alternative designs

11  should be excluded because the "mere existence of French Presses that use plastic or steel carafes,

12  including those sold by Bodum, does not prove that French Presses that use glass carafes, as many

13  do, are per se defective."  Defendant's *Daubert* Motion at 13.  This "straw man" argument is

14  frivolous as Mr. Goldman does not opine in any of his reports that the Grant French Press is

15  defective "per se" simply because it is made out of glass.  Mr. Goldman's opinion goes to one of

16  the elements of the risk-benefit test for determining whether a product is defective, which is the

17  test Bodum contends applies in this case, and Mr. Goldman has sufficient training as an engineer

18  to offer those opinions.  Bodum has pointed to nothing that suggests that under *Daubert* and Rule

19  702, Mr. Goldman should not be permitted to offer these opinions.

20      f.   Bodum's Response

21      Bodum asks the Court to exclude Mr. Goldman's opinions that it did not respond

22  adequately to a significant increase in claims of injuries involving the Bodum French Press in

23  2018.  First, it contends the opinion that Bodum should have promptly investigated when the

24  number of complaints increased is not based on any existing industry or legal standard given that

25  the number of complaints is small as a percentage of sales. This argument goes to the weight of

26  Mr. Goldman's opinion, not its admissibility under Rule 702 and *Daubert*.  Second, Bodum

27  contends Mr. Goldman does not have sufficient experience to offer these opinions because his

28  work at Coca Cola gave him experience only as to the response of a manufacturer to safety

1  complaints and not that of a distributor like Bodum.  Yet Bodum offers no reasoning or authority

2  in support of this argument, which the Court finds unpersuasive. To the extent the industry

3  standards that apply to a distributor are different from those that apply to a manufacturer (Bodum

4  has pointed to no evidence that they are), this issue can be addressed through cross-examination at

5  trial.

6  Finally, the Court rejects Bodum's assertion that Mr. Goldman's opinions based on CPSC

7  requirements are inadmissible because they constitute improper legal conclusions.   As a general

8  rule, experts may refer to their understanding of the requirements of statutes and regulations in

9  offering testimony about industry norms and practices.  *See Hangarter v. Provident Life & Acc.*

10  *Ins. Co*., 373 F.3d 998, 1017 (9th Cir. 2004) (holding that although expert testimony that "the

11  defendant departed from insurance industry norms relied in part on his understanding of the

12  requirements of state law" it was admissible and observing that "a witness may refer to the law in

13  expressing an opinion without that reference rendering the testimony inadmissible.").  While

14  Bodum may raise evidentiary objections at trial if it believes Mr. Goldman's testimony includes

15  improper legal conclusions, this challenge is not a proper subject for a *Daubert* motion.

16  **B.   Summary Judgment**

17  **1.   Federal Rule of Civil Procedure 56**

18  Summary judgment on a claim or defense is appropriate "if the movant shows that there is

19  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

20  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

21  the absence of a genuine issue of material fact with respect to an essential element of the non-

22  moving party's claim, or to a defense on which the non-moving party will bear the burden of

23  persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

24  Once the movant has made this showing, the burden then shifts to the party opposing

25  summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.*

26  (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely

27  disputed must support the assertion by . . . citing to particular parts of materials in the record

28  . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the

1   substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v.*

2   *Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of

3   identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan*

4   *v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the

5   record in search of a genuine issue of triable fact.  *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237

6   F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

7         A party need not present evidence to support or oppose a motion for summary judgment in

8   a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable

9   to presentation in an admissible form.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

10  2003).  Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

11  are sufficient to raise genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co.,*

12  *Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).  On summary judgment, the court draws all

13  reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378

14  (2007), but where a rational trier of fact could not find for the non-moving party based on the

15  record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.

16  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

17                **2. Claim One (Design Defect)**

18                  a.   Legal Standards Governing Existence of a Design Defect

19        "A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or

20  design of its product causes injury while the product is being used in a reasonably foreseeable

21  way." *Soule v. General Motors Corp*., 8 Cal. 4th 548, 560 (1994).  Under California law, there are

22  two tests for demonstrating a design defect. *Barker v. Lull Engineering Co*., 20 Cal. 3d 413, 429-

23  30 (1978). Under the first test, referred to as the "consumer expectations test," "a product may be

24  found defective in design if the plaintiff demonstrates that the product failed to perform as safely

25  as an ordinary consumer would expect when used in an intended or reasonably foreseeable

26  manner." *Id*. at 429.  "Under this standard, an injured plaintiff will frequently be able to

27  demonstrate the defectiveness of a product by resort to circumstantial evidence, even when the

28  accident itself precludes identification of the specific defect at fault." *Id.* at 430.  This test "is

United States District Court
Northern District of California

1    reserved for cases in which the everyday experience of the product's users permits a conclusion

2    that the product's design violated minimum safety assumptions, and is thus defective regardless of

3    expert opinion about the merits of the design." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 567

4    (1994).   In other words, "[i]n particular circumstances, a product's design may perform so

5    unsafely that the defect is apparent to the common reason, experience, and understanding of its

6    ordinary consumers." *Id.* at 569.

7            Because in many situations the ordinary consumer would "'not know what to expect

8    because he would have no idea how safe the product could be made[,]'" however, California

9    courts have recognized that the "expectations of the ordinary consumer cannot be viewed as the

10   exclusive yardstick for evaluating design defectiveness." *Barker*, 20 Cal. 3d at 430 (quoting

11   Wade, On the Nature of Strict Tort Liability for Products, supra, 44 Miss.L.J. 825, 829).   Rather,

12   "a product may be found defective in design, even if it satisfies ordinary consumer expectations, if

13   through hindsight the jury determines that the product's design embodies 'excessive preventable

14   danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged

15   design outweighs the benefits of such design." *Id.* at 430.   This second test is commonly referred

16   to as the risk-benefit test.   Among the factors that are considered under the risk-benefit test are

17   "the gravity of the danger posed by the challenged design, the likelihood that such danger would

18   occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved

19   design, and the adverse consequences to the product and to the consumer that would result from an

20   alternative design." *Id.* at 431.

21           Because "one of the principal purposes behind the strict product liability doctrine is to

22   relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence

23   cause of action[,] the California Supreme Court has held that in applying the risk-benefit test, a

24   plaintiff need only make a "prima facie case showing that the injury was proximately caused by

25   the product's design." *Id.* The burden of proof then "shifts to the defendant to prove, in light of

26   the relevant factors, that the product is not defective." *Id.* As a general rule, expert testimony is

27   required to establish that a design defect proximately caused the plaintiff's injury when a plaintiff

28   seeks to establish the existence of a design defect under the risk-benefit test. *See Whiteley v.*

1   *Philip Morris Inc*., 117 Cal. App. 4th 635, 702 (2004), as modified on denial of reh'g (Apr. 29,

2   2004) (holding that where design defect case alleging that defendant's cigarettes were defective

3   was tried under a risk-benefit theory, plaintiff was required to offer competent expert testimony to

4   establish that smoking the defendant's cigarettes was the actual cause of the lung cancer that killed

5   the plaintiff).

6          "[A] plaintiff may proceed under either or both" tests to establish a design defect.

7   *McCabe v. American Honda Motor Co*., 100 Cal.App.4th 1111, 1126 (2002).

8                  b.  Legal Standards Governing Affirmative Defense of Misuse

9          Even where a plaintiff has made a prima facie case that a design defect was the legal cause

10  of their injuries, that is, that it was a substantial contributing factor, a defendant is absolved of

11  liability "when an independent event intervenes in the chain of causation, producing harm of a

12  kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law

13  deems it unfair to hold him responsible." *Soule*, 8 Cal. 4th at 573 n. 9.  Under the doctrine of

14  superseding cause, product misuse is an affirmative defense to a design defect claim when the

15  misuse was "'so highly extraordinary as to be unforeseeable.'" *Chavez v. Glock, Inc*., 207 Cal.

16  App. 4th 1283, 1308 (2012) (quoting *Perez v. VAS S.p.A*., 188 Cal.App.4th 658, 685, 115 (2010));

17  *see also* Judicial Council Of California Civil ("CACI") Jury Instruction 1245 ("Affirmative

18  Defense – Product Misuse/Modification" Instruction, providing that the defendant must establish

19  that  "[t]he [misuse . . .] was so highly extraordinary that it was not reasonably foreseeable to

20  [name of defendant], and therefore should be considered as the sole cause of [name of plaintiff]'s

21  harm.").

22                  c.  Discussion

23         Bodum contends it is entitled to summary judgment on Plaintiff's design defect claim

24  because competent expert testimony is required to establish the existence of a design defect under

25  the risk-benefit test; because Mr. Goldman's opinions do not meet the requirements of *Daubert*

26  and Rule 702, it asserts, Plaintiff cannot prevail on her design defect claim.  The Court rejects this

27  argument for two reasons.  First, for the reasons discussed above, the Court finds that Bodum's

28  challenges to Mr. Goldman's opinions go to their weight and not their admissibility and therefore

United States District Court
Northern District of California

1    that Mr. Goldman's opinions are admissible.

2         Second, the Court concludes that Plaintiff is correct that this case is governed by the

3    consumer expectation test, which does not require expert testimony.  *See Soule*, 8 Cal.4th at 567,

4    34 Cal.Rptr.2d 607, 882 P.2d 298 (expert testimony as to what consumers ordinarily "expect" is

5    generally improper).  The consumer expectations test applies if "the facts permit an inference that

6    the product at issue is one about which consumers may form minimum safety assumptions in the

7    context of a particular accident."  *McCabe*, 100 Cal.App.4th at 1120.  On the other hand, a

8    "complex product" such as an automobile "may often cause injury in a way that does not engage

9    its ordinary consumers' reasonable minimum assumptions about safe performance" and therefore

10   is more appropriately addressed under the risk-benefit test.  *See Soule*, 8 Cal. 4th at 566–67

11   (citing *Barker*, 20 Cal. 3d at 430).  Here, Bodum's French Press requires no special training and is

12   sold to the general public for every-day use.  Moreover, the circumstances of the accident are

13   relatively straightforward: the undisputed facts establish that the glass beaker exploded when

14   Plaintiff was using the French Press to make coffee.  The Court concludes that under these

15   circumstances, a fact-finder may form minimum safety assumptions about the French Press in the

16   context of their own ordinary expectations and therefore, that "[t]his product squarely fits within

17   the realm of the consumer expectation test." *Mariscal v. Graco, Inc*., 52 F. Supp. 3d 973, 986

18   (N.D. Cal. 2014) (holding on summary judgment that consumer expectation test applied to paint

19   sprayer that was marketed to "low-end user" and that exploded while plaintiff was attempting to

20   use it).  Therefore, the Court declines to enter summary judgment in Bodum's favor on the design

21   defect claim.

22        The Court also declines to enter summary judgment in M.G.'s favor on her design and

23   manufacturing defect claims based on Bodum's failure to introduce evidence of misuse.  This is a

24   close call given that Bodum's own expert has refused to testify that M.G. misused the French

25   Press and has not offered any opinion stating that M.G.'s age was a cause of the accident.  Instead,

26   Bodum relies on Dr. Ganot's test results and calculations to establish causation based on a process

27   of elimination, arguing that he has shown that the fracture could *only* have been caused by misuse

28   and that it was unforeseeable, as a matter of law, because Bodum warned against children using its

French Press.  Opposition to Plaintiff's *Daubert*/Summary Judgment Motion at 19 (citing *Huynh v. Ingersoll-Rand*, 16 Cal. App. 4th 825, 833 (1993) (holding that where misuse affirmative defense was based on a foreseeable misuse, the defendant remained liable unless it provided an adequate warning)).  But in order to grant summary judgment in Plaintiff's favor, she must establish not only that Bodun's affirmative defense fails as a matter of law but also that the undisputed evidence is sufficient to satisfy her own burden of demonstrating a defect that caused her injuries.  Given that there are factual disputes about the specific factors that caused the Grant French Press to fracture and whether it was, in fact, defective, the Court declines to enter summary judgment in Plaintiff's favor on these claims.

### 3. Claim Two (Manufacturing Defect)

"A manufacturing defect occurs when a product does not conform to the manufacturer's intended design." *Carlin v. Superior Court*, 13 Cal. 4th 1104, 1121(1996).  "In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Barker*, 20 Cal. 3d at 429. Here, Mr. Goldman stated in his expert report that he observed no manufacturing defects on the Grant French Press when he examined it, but he also opined that the Bodum French Press was designed to be 2.5 mm. thick and that the Grant French Press was only 1.94 mm. thick, which could support a reasonable inference that the 1.94 mm. thickness  of the Grant French Press constituted a manufacturing defect.  Likewise, findings of both Mr. Goldman and Dr. Ganot as to the circumference of the uncompressed piston of the Grant French Press as compared to other exemplars of the same model could also support a reasonable inference that the excessive width of the piston in the Grant French Press was a manufacturing defect.  *See* Rose *Daubert* Opposition Decl., Ex. 4 (Goldman Dep.) at 185 (opining that the diameter of the uncompressed piston of the Bodum French Press varies and that an exemplar purchased by Mr. Goldman had a smaller diameter than the Grant French Press); Baghdadi *Daubert*/Summary Judgment Decl., Ex. 6 (Ganot File) (reflecting that the uncompressed piston width of the Grant French Press was 97.72 whereas the width of the piston of the one exemplar Dr. Ganot measured varied between 94.02 and 95.33 mm.).  Therefore, the Court finds that

1    Bodum is not entitled to summary judgment on this claim.

2                    **4. Claim Three (Negligence)**

3            Bodum challenges Plaintiff's negligent design and manufacture claims on the same

4    grounds it seeks summary judgment on Plaintiff's strict liability design and manufacturing defect

5    claims.  For the reasons discussed above, the Court rejects those challenges.  Bodum also contends

6    it is entitled to summary judgment on this claim because Plaintiff has offered no admissible

7    evidence of negligent testing, sale or marketing, or that it was on notice that its product was

8    dangerous.  Yet  as discussed above, Mr. Goldman has offered admissible testimony that Bodum

9    does not inspect its French presses after they are imported,  does not investigate safety complaints,

10   and failed to react to an increase in injury complaints in 2018, even though  it is standard industry

11   practice to do so.  This evidence is sufficient to create material disputes of fact that preclude

12   summary judgment on Plaintiff's negligence claims.

13                   **5. Claim Four (Failure to Warn)**

14           In addition to defects based on design and manufacturing, California law recognizes that a

15   product may be defective based on inadequate warnings. *Webb v. Special Elec. Co.*, 63 Cal. 4th

16   167, 180 (2016) ("The third type of defect 'is a product that is dangerous because it lacks adequate

17   warnings or instructions.'" (citation omitted)).  "[A] product, although faultlessly made, may

18   nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability

19   if it is unreasonably dangerous to place the product in the hands of a user without a suitable

20   warning and the product is supplied and no warning is given."  *Saller v. Crown Cork & Seal Co.,*

21   *Inc.*, 187 Cal. App. 4th 1220, 1238 (2010) (internal quotations and citations omitted).

22           Like design and manufacturing defect claims, a claim based on failure to warn requires that

23   "the plaintiff . . . prove that the defendant's failure to warn was a substantial factor in causing his

24   or her injury." *Huitt v. S. Cal. Gas Co.*, 188 Cal. App. 4th 1586, 1604 (2010).  "The natural

25   corollary to this requirement is that a defendant is not liable to a plaintiff if the injury would have

26   occurred even if the defendant had issued adequate warnings." *Id.* (explaining that the proper issue

27   in determining causation is "whether any warning issued by the defendant would have reached the

28   plaintiffs"). "Generally, when a warning is given, but the person to whom the warning is directed

United States District Court
Northern District of California

37

does not read the warning, there is no causation." *Altman v. HO Sports Co*., 821 F.Supp.2d 1178, 1188 (E.D.Cal.2011) (citing *Conte v. Wyeth, Inc*., 168 Cal. App. 4th 89, 112 (2008) ("There can be no proximate cause where, as in this case, the prescribing physician did not read or rely upon the allegedly inadequate warnings promulgated by a defendant about a product.")).Thus, in *Monigan v. Nat'l Presto Indus., Inc*., No. C 12-3698 SI, 2013 WL 6662319, at *4 (N.D. Cal. Dec. 17, 2013), the Court granted summary judgment on a failure to warn claim where the plaintiff had testified that he had never seen the deep fryer that caused his injuries until the night of the incident and when the incident occurred it was too dark for him to read the warnings on the tag attached to the electrical cord.  Under those circumstances, the court found that the allegedly inadequate warning on the tag did not cause the plaintiff's injuries because "[e]ven if the product contained the warnings proposed by plaintiffs, Mr. Monigan would not have seen them because it was too dark in his kitchen to read the warnings."  *Id.*  at * 4.

Here, it is undisputed that Mr. Grant threw away the instructions without reading them when he took the French Press out of its packaging.  As a consequence, no matter what warnings were included in the instructions, they would not have been seen by Plaintiff or her parents.  In addition, there is no evidence in the record that any of the Grants read the warnings printed on the glass beaker and in fact, both Mr. and Mrs. Grant testified that they had not read them.  Under these circumstances, the Court concludes that Plaintiff cannot establish causation on her failure to warn claim and therefore, the Court GRANTS summary judgment on that claim.

### 6. Claim Five (Breach of Implied Warranty)

"Under UCC § 2–315, an implied warranty of fitness for a particular purpose exists if at the time of contracting the seller knows or has reason to know that the buyer is relying on the seller's skill or judgment to select or to furnish suitable goods for certain purpose."  *Stearns v. Select Comfort Retail Corp*., No. 08-2746 JF, 2009 WL 1635931, at *7 (N.D. Cal. June 5, 2009) (citing *Am. Suzuki Motor Corp. v. Super. Ct*., 37 Cal.App.4th 1291, 1295 n. 2 (1995)).   In contrast, an implied warranty of merchantability is an implied warranty by the seller that a product is "fit for the ordinary purposes for which such goods are used."  *Am. Suzuki Motor Corp. v. Super. Ct*., 37 Cal. App. 4th at 1295.

United States District Court
Northern District of California

Plaintiff does not dispute that she has not alleged a particular purpose, which is an essential element of a claim for breach of implied warranty of fitness for a particular purpose. *See Houghtailing v. Crown Equip. Corp.*, No. 11-CV-05040-TEH, 2015 WL 1090386, at *3 (N.D. Cal. Mar. 12, 2015). Instead, she seeks to convert the claim to one for a breach of implied warranty of merchantability, noting that the claim "as alleged is entitled 'Breach of Implied Warranty' and does not disclaim the warranty of merchantability." Opposition to Bodum Summary Judgment Motion at 14 (citing Cal. Comm. Code § 2314). She further points to allegations throughout the complaint that she contends put Bodum on notice that she was asserting a claim for breach of the implied warranty of merchantability. Yet the language of the claim itself is clear on its face, alleging that Bodum sold the French Press to the Grants knowing that ordinary consumers use the product "for a particular purpose," that the Grants relied on Bodum's expertise to "furnish a product that was suitable for a particular purpose, namely for making coffee[,]" and that the Grant French Press was not "suitable for  a particular purpose." This claim cannot reasonably be construed as a claim for breach of the implied warranty of merchantability and the time for amending the complaint is long past. Therefore, the Court GRANTS summary judgment in Bodum's favor as to this claim.

### 7. Claim Six (Failure to Recall/Retrofit)

A claim for failure to recall/retrofit sounds in negligence and  requires that the following elements be established:  "(1) defendant manufactured/distributed/sold the product; (2) defendant knew or reasonably should have known that the product was dangerous when used in a reasonably foreseeable manner; (3) defendant became aware of this defect after the product was sold; (4) defendant failed to recall/retrofit; (5) that a reasonable manufacturer/distributor/seller under the same or similar circumstances would have recalled/retrofitted the product; (6) plaintiff was harmed; and (7) defendant's failure to recall/retrofit was a substantial factor in causing plaintiff's harm." *Arnett v. Seaside Transportation Servs.*, LLC, No. 13-CV-01672-WHO, 2014 WL 117325, at *3 n. 6 (N.D. Cal. Jan. 13, 2014) (citing CACI No. 1223). Bodum seeks summary judgment on this claim on the grounds that Plaintiff has not offered admissible evidence of the existence of a design defect or that Bodum was on notice that its product was dangerous. The

United States District Court
Northern District of California

Court rejects the first argument for the reasons discussed above.  The second argument also fails.

Mr. Goldman has offered admissible opinions that there was a spike in injury complaints made to

Bodum and that it is standard practice to investigate and react even to a small number of injury

claims.  This evidence is sufficient to raise material disputes of fact on this claim.  Therefore, the

Court denies Bodum's request for summary judgment on Plaintiff's claim for failure to

recall/retrofit.

**IV.     CONCLUSION**

      For the reasons stated above, the Court DENIES Plaintiff's *Daubert*/Summary Judgment

Motion and Defendant's *Daubert* Motion.  The Court GRANTS Defendant's Summary Judgment

Motion as to Claims Four and Five, which are dismissed with prejudice, and DENIES that motion

in all other respects.

      **IT IS SO ORDERED.**

Dated:  February 24, 2021

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

40